Ernest N. Reddick (State Bar No. 048522)
ereddick@nixonpeabody.com
Rosalyn P. Mitchell (State Bar No. 173829)
rmitchell@nixonpeabody.com
David A. Kolek (State Bar No. 245330)
dkolek@nixonpeabody.com
NIXON PEABODY LLP
One Embarcadero Center, 18th Floor
San Francisco, CA 94111-3600
Telephone:  (415) 984-8200
Facsimile:   (415) 984-8300

Attorneys for Plaintiff
HANSON AGGREGATES MID-PACIFIC, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANSON AGGREGATES MID-PACIFIC, INC., <br><br> Plaintiff, <br><br> vs. <br><br> PIONEER vessel, IN REM, its engines, tackle, equipment, furnishings and machinery, IN PERSONAM MARBULK CANADA INC., MARBULK SHIPPING, INC., CSL INTERNATIONAL INC., <br><br> Defendants. | Case No. C07 3849-JL <br><br> **FIRST AMENDED VERIFIED COMPLAINT IN PERSONAM FOR BREACH OF MARITIME CONTRACT, NEGLIGENCE, AND IN REM FOR DAMAGE TO CARGO** |

Plaintiff HANSON AGGREGATES MID-PACIFIC, INC. ("Plaintiff" or "HANSON"), alleges its First Amended Complaint against MARBULK CANADA INC., MARBULK SHIPPING, INC. (collectively "MARBULK") and CSL INTERNATIONAL INC., ("CSL"), In Personam, and the vessel PIONEER (04-22), In Rem, as follows:

1.  This Court has jurisdiction under 28 U.S.C. §1333. This is an admiralty and maritime claim within the meaning of Rules 9(h) of the Federal Rules of Civil Procedure and

-1-

FIRST AMENDED VERIFIED COMPLAINT IN PERSONAM
FOR BREACH OF MARITIME CONTRACT, NEGLIGENCE,
AND IN REM FOR DAMAGE TO CARGO
CASE NO.CO7 3849-JL

10773658.3

the Supplemental Rules thereto governing certain admiralty and maritime claims, and is within the jurisdiction of this Court.

2. At all relevant times, Plaintiff was and now is a corporation organized and existing under the laws of Delaware, U.S.A., having its principal place of business at 3000 Busch Road, Pleasanton, California.

3. At all relevant times, Plaintiff was the owner of a cargo of sand which is the subject of this case.

4. Plaintiff is informed and believes, and on that basis alleges, that defendants MARBULK CANADA, INC. and MARBULK SHIPPING, INC. are, and at all relevant times, were, corporations registered to do business and doing business in the State of California, with principal places of business in Canada and Beverly, Massachusetts, respectively. MARBULK SHIPPING, INC. and MARBULK CANADA, INC. referred to herein collectively as ("MARBULK"). MARBULK was and still is a carrier of merchandise by water for hire, controlled, owned and/or managed the Vessel at all times pertinent hereto, which vessel is now or will be within the jurisdiction of this Honorable Court during the pendency of this action.

5. Defendant vessel, PIONEER (04-22) (hereinafter "the Vessel") is a cargo vessel. The Vessel is, and was at all relevant times, owned by MARBULK.

6. Plaintiff is informed and believes, and on that basis alleges, that defendant CSL INTERNATIONAL INC., ("CSL") is, and at all relevant times mentioned was, a corporation organized under the laws of Barbados, with its registered office at Clarke & Co., Parker House, Wildey Road, St. Michael, Barbados. At all relevant times, CSL was doing business in the State of California. Defendant MARBULK and defendant CSL are collectively referred to as "Defendants" throughout this complaint.

FIRST AMENDED VERIFIED COMPLAINT IN PERSONAM
FOR BREACH OF MARITIME CONTRACT, NEGLIGENCE,
AND IN REM FOR DAMAGE TO CARGO
CASE NO.C07 3849-JL

10773658.3

7. Pursuant to a written Contract of Affreightment ("COA") dated August 3, 2001, CSL agreed to carry cargoes for HANSON AGGREGATES MID-PACIFIC, INC. A true and correct copy of the COA referred to above is attached as Exhibit A to this complaint.

8. Clause 1.1. (e) of the COA provides that "Owner" means "CSL or the owners of any vessel utilized in the performance of the Contract." Plaintiff is informed and believes, and on that basis alleges, that defendant CSL was not the owner of the Vessel.

9. Plaintiff is informed and believes, and on that basis alleges, that defendant CSL had an agreement with MARBULK to carry cargoes of HANSON AGGREGATES MID-PACIFIC, INC.

10. Plaintiff is informed and believes, and on that basis alleges, that prior to the Vessel going into service for Plaintiff, defendant CSL informed Plaintiff that new discharge gates had been installed on the Vessel and that the gates would not cause the Hanson cargo to be contaminated.

11. On or about July 23, 2004, the Vessel arrived in Sechelt, British Columbia, Canada to be loaded with Plaintiff's sand. Plaintiff is informed and believes, and on that basis alleges that, in an attempt to prevent leakage of the sand from the gates, rubber foam was used to seal the cargo discharge gates.

12. On or about July 28, 2004, the Vessel arrived at the Anchorage 9 San Francisco Bay to discharge a portion of the cargo to a lightering barge. Plaintiff alleges on information and belief that foam rubber used to seal the discharge gates from the cargo hold contaminated the sand as it was being discharged. This seriously damaged the cargo and caused it to depreciate in value.

13. On or about July 29, 2004, the remainder of the cargo was delivered by the Vessel to Hanson's customer, RMC Pacific Materials, Inc./Harbor Sand and Gravel Inc. (" RMC Harbor") in Redwood City. When the Vessel arrived at RMC Harbor's dock and the

-3-

FIRST AMENDED VERIFIED COMPLAINT IN PERSONAM
FOR BREACH OF MARITIME CONTRACT, NEGLIGENCE,
AND IN REM FOR DAMAGE TO CARGO
CASE NO.CO7 3849-JL

10773658.3

cargo was discharged from the containers, the foam rubber used to seal the discharge gates again was discharged in the sand.

14. On or about July 30, 2004, Plaintiff first became aware that the foam rubber material was found in the sand.

15. On or about July 30, 2004, RMC Harbor refused to accept the sand cargo that was discharged in Redwood City due to contamination.

16. On or about August 2, 2004, Plaintiff made arrangements to re-screen the contaminated sand to remove the foam rubber material.

17. The total volume of contaminated sand discharged from the Vessel was 35,271.56 metric tons. The volume of contaminated sand discharged at RMC Harbor was 31,108.5 metric tons, or 34,290.67 short tons.

18. The original sales price for the sand was $14.75 per short ton. Due to the contamination, Hanson ultimately sold the 34,290.67 short tons of sand to RMC Harbor for $5.00 per short ton.

19. Hanson immediately communicated the problems with the contaminated sand to CSL. In or about August, 2004, the sand was inspected and contamination noted by Cullin Maritime, CSL's claims adjuster.

20. On August 4, 2004, David King ("King"), CSL's Vice President, wrote an email to Bill Butler ("Butler"), Vice President of Operations at Hanson. King stated that CSL was "taking the vessel out of service for approximately two days in order to fix the gates that required the foam packing." King also stated that he was confident there would not be "similar issues in the future."

21. On August 20, 2004, after conferring with Cullen Maritime, CSL's claims adjuster, King wrote an email to Butler in which he detailed CSL's proposal to Hanson to resolve the issue of Hanson's contaminated cargo. King proposed that: "CSL/insurers would

-4-

FIRST AMENDED VERIFIED COMPLAINT IN PERSONAM
FOR BREACH OF MARITIME CONTRACT, NEGLIGENCE,
AND IN REM FOR DAMAGE TO CARGO
CASE NO. CO7 3849-JL

10773658.3

be responsible for the costs associated with the screening plus they would provide an indemnity for the remainder of the cargo landed value up to the extent of a total loss."

22. On August 24, 2004, Butler responded by email to CSL's proposal by providing CSL with the estimated total landed cost of the material at Redwood City.

23. On September 24, 2004, King wrote an email to Butler requesting a "detailed report" of the expected magnitude of Hanson's claim, back up documentation related to the claim, and any efforts by Hanson to mitigate the damage. King also stated that: "Our insurers are amongst the most reputable in the world and we have no reason to believe that they will not honor your claim provided it is put before them in an organized and reasonable state."

24. On September 24, 2004, Butler wrote an email to King, attaching a report which detailed the expected magnitude of Hanson's claim for the damaged sand. Butler promised to send the backup information and mitigation information shortly thereafter.

25. After acknowledging liability for the damage, CSL did not make payment on Hanson's claim. At all pertinent times, Hanson was led to believe that Defendants would pay Hanson's claim for the contaminated sand.

26. Based on his direct and personal involvement in the on-going correspondence between Hanson and CSL, Butler understood that CSL had accepted liability for the damage to Hanson's cargo. Plaintiff is informed and believes, and on that basis alleges that shortly after CSL was made aware of cargo damages, the vessel was taken out of service in order to fix the gate that required foam packing. Hanson's claim had been essentially resolved. All that remained was the matter of working out the details of the costs of mitigation.

27. On July 22, 2005, Hanson's Corporate Counsel, James L. Wallmann ("Wallmann"), sent a letter to King and Mike Bedford ("Bedford"), CSL's Director of Risk Management. The letter included attachments showing the exact cost of the damage to Hanson's cargo, invoices and other back up documentation related to the cargo, and the

-5-

FIRST AMENDED VERIFIED COMPLAINT IN PERSONAM
FOR BREACH OF MARITIME CONTRACT, NEGLIGENCE,
AND IN REM FOR DAMAGE TO CARGO
CASE NO.C07 3849-JL

10773658.3

efforts undertaken by Hanson to mitigate the damage. The letter included an offer to compromise the claim.

28. On July 22, 2005, King acknowledged receipt of Wallmann's letter by email.

29. On August 1, 2005, Bedford wrote a letter to Wallmann in which he requested still further information related to Hanson's mitigation efforts.

30. On August 22, 2005, Wallmann responded to Bedford's August 1, 2005 letter. Wallmann reiterated Hanson's claim, its efforts at mitigation, and referred Bedford to the supporting documentation that had been sent with Wallmann's July 22, 2005 letter. Although the parties had not yet reached a final course of action to resolve the matter, Wallmann's July 22, 2005 letter highlighted the cooperation of the parties since Hanson first informed CSL of its claim. While Hanson understood that no final decision had been made, Hanson expected that the resolution of the claim would be along the lines of what the parties had previously discussed.

31. On November 20, 2006, Bedford wrote an email to Jeffrey Brummert, Hanson's Vice President and General Manager. Bedford's email was in response to Brummert's telephone inquiries to Bedford related to Hanson's outstanding claim regarding the contaminated sand. Bedford stated that he was familiar with the claim and thanked Hanson for its "continued patience while [he] look[ed] into this matter."

### FIRST CLAIM FOR RELIEF

**Breach of Contract**
**(By Plaintiff Against Defendant**
**CSL, <u>In Personam</u>)**

32. Plaintiff incorporates paragraphs 1–31 above as though set forth fully herein.

33. Plaintiff has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms of the COA attached hereto as Exhibit A.

34. Defendant breached the COA in various and numerous respects including, but not limited to: failing to perform under the COA, giving improper instructions to the Vessel

-6-

FIRST AMENDED VERIFIED COMPLAINT IN PERSONAM
FOR BREACH OF MARITIME CONTRACT, NEGLIGENCE,
AND IN REM FOR DAMAGE TO CARGO
CASE NO. C07 3849-JL

10773658.3

which resulted in contamination of the cargo, and failing to honor the warranties set forth in the COA. Defendant may amend and supplement the allegations of this paragraph as additional breaches are determined.

35.   As a result of defendants' breach, HANSON has sustained damage in an amount in excess of the jurisdictional minimum of this court, according to proof at trial, including consideration furnished by plaintiff, specifically $334,334, the cost of re-screening the contaminated cargo, the cost of selling the cargo for less than the contracted for price, significant time, effort and internal resources attempting to resolve the issue, and any and all other consequential and incidental damages proven at trial.

36.   As a result of the breaches of contract detailed above, defendant is liable to the plaintiff in the sum of at least $334,334.

## SECOND CLAIM FOR RELIEF

### Negligence
### (By Plaintiff Against Defendants CSL, MARBULK CANADA INC., and MARBULK SHIPPING, INC.,, In Personam)

37.   Plaintiff incorporates paragraphs 1–36 above as though set forth fully herein.

38.   Defendants had a duty to deliver the cargo in good order and condition at its destination. CSL and the Vessel were obligated to care for and to properly and carefully discharge the cargo. In the course of discharging the cargo on or about July 28, 2004 and July 29, 2004, defendants CSL and the Vessel negligently and in breach of their respective contractual obligations, caused the cargo to be contaminated. As a result of the contamination, the cargo depreciated in value.

39.   Defendants breached their duty by delivering the cargo in a defective manner.

40.   Defendants' breach of duty caused plaintiff damage in an amount in excess of the jurisdictional minimum of this court, according to proof at trial.

-7-

FIRST AMENDED VERIFIED COMPLAINT IN PERSONAM
FOR BREACH OF MARITIME CONTRACT, NEGLIGENCE,
AND IN REM FOR DAMAGE TO CARGO
CASE NO. C07 3849-JL

10773658.3

## THIRD CLAIM FOR RELIEF

**(By Plaintiff Against Defendant The PIONEER, In Rem)**

41. Plaintiff incorporates paragraphs 1–40 above as though set forth fully herein.

42. At all relevant times, the Vessel was acting for defendant CSL in performing the loading and stowage of the container(s) in which Plaintiff's cargo had been placed.

43. On or about July 23, 2004, Plaintiff's cargo was received by the Vessel in good order and condition at Sechelt, British Columbia, Canada for export. The Vessel was thereafter obligated to care for and to properly and carefully load the sand onboard the Vessel. Plaintiff alleges on information and belief that foam rubber used to seal the discharge gates from the cargo hold contaminated the sand as it was being discharged. This seriously damaged the cargo and caused it to depreciate in value.

44. Plaintiff claims damages in the amount of $334,334, the cost of selling the cargo for less than the contracted for price, and any and all other consequential and incidental damages proven at trial.

WHEREFORE, HANSON prays for judgment against defendants, and each of them, as follows:

**On First and Second Claim for Relief against CSL and MARBULK:**

1. For compensatory damages, according to proof at trial;
2. For consequential and incidental damages, according to proof;
3. For HANSON's attorneys' fees, costs of suit, and other necessary disbursements incurred in connection with this action; and
4. For prejudgment interest, and such other relief as the court deems just and proper.

**On the Third Claim for Relief against Vessel:**

1. That warrants for the arrest of the <u>In Rem</u> Defendants may issue against the Vessel and its engines, tackle, equipment, and appurtenances;

2. That the Vessel, its engines, tackle, equipment, and appurtenances, may be condemned and sold to satisfy the amount found due to plaintiff, with interest, costs and reasonable attorneys' fees;

3. For a judgment in favor of HANSON and against the Vessel PIONEER in an amount not less than $334,334 plus interest, and a decree that such vessel be condemned and sold to satisfy Plaintiff's judgment;

4. That the above-named defendants may be cited to appear and answer all and singular the matters aforesaid and that a decree may be entered herein in favor of plaintiff for the amount of its claim, with interest and costs;

5. That plaintiff may have such other and further relief as in law and justice it may be entitled to receive.

Dated: November 16, 2007                             NIXON PEABODY LLP


By:     /s/
        ROSALYN P. MITCHELL
        Attorneys for Plaintiff
        HANSON AGGREGATES MID-PACIFIC, INC.

-9-
FIRST AMENDED VERIFIED COMPLAINT <u>IN PERSONAM</u>
FOR BREACH OF MARITIME CONTRACT, NEGLIGENCE,
AND <u>IN REM</u> FOR DAMAGE TO CARGO
CASE NO. C07 3849-JL

10773658.3

## VERIFICATION

I, Bill Butler, am Vice President of Operations of Northern California Aggregates, Hanson Mid-Pacific, Inc, and am authorized to make this verification. I have read the foregoing Verified Complaint In Personam For Breach of Maritime Contract and In Rem For Damage to Cargo. All allegations made in the Complaint are either based on information of which I have personal knowledge as a result of my duties and responsibilities as Vice President, or are based on information obtained from the business records and personnel of HANSON AGGREGATES MID-PACIFIC, INC., and all of the matters alleged in the Complaint are true to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed on November 15, 2007 at Pleasanton, California.

_____
Bill Butler

FIRST AMENDED VERIFIED COMPLAINT IN PERSONAM FOR BREACH OF MARITIME CONTRACT, NEGLIGENCE, AND IN REM FOR DAMAGE TO CARGO
CASE NO. C07 3849-JL

-10-

10773658.3