EXHIBIT A

# CONTRACT OF AFFREIGHTMENT

BETWEEN

## CSL INTERNATIONAL INC.

AND

## HANSON AGGREGATES MID PACIFIC, INC.

**(August 3, 2001)**

**First Original of Two**

# **Table of Contents**

1. Definitions and Appendices.................................................................5
   1.1    Definitions ...............................................................................5
   1.2    Appendices ............................................................................5
2. Period.............................................................................................6
3. Cargo .............................................................................................6
4. Vessels ..........................................................................................6
5. Cargo Quantity, Shipment Size and Scheduling .................................7
6. Load Port .......................................................................................9
7. Discharge Ports ..............................................................................9
8. Loading Terms ..............................................................................11
9. Discharging Terms ........................................................................11
10. Demurrage & Despatch..................................................................12
11. Damage to Vessel and/or Equipment .............................................13
12. Freight Rates ................................................................................13
13. Freight Rate Re-Opener.................................................................15
14. Freight Rate Adjustments...............................................................15
15. Commission ..................................................................................16
16. Payment Terms .............................................................................16
17. Deadfreight ...................................................................................16
18. Notices .........................................................................................17
19. Governing Law ..............................................................................18
20. Arbitration.....................................................................................19
21. Clause Paramount and Limitation of Liability ..................................20
22. Other Shipping Terms ....................................................................20
    22.1    Both-To-Blame Collision Clause....................................20
    22.2    New Jason Clause. .......................................................21
    22.3    Ice Clause ....................................................................21
    22.4    Liberties........................................................................21
    22.5    Responsibility Before and After Loading or Discharge ....22
    22.6    Lien ..............................................................................22
    22.7    General Average ...........................................................22
    22.8    Himalaya .......................................................................23
    22.9    War Risks......................................................................23
    22.10   Seizure and Arrest.........................................................25
    22.11   Pollution ........................................................................26
23. Force Majeure ...............................................................................26
    23.2    Consequences of Force Majeure ...................................27
24. Assignment ...................................................................................29
25. Cargo Receipts, Precedence .........................................................29
26. Agents...........................................................................................29
27. Insurance, Indemnification, Liability Limitations ..............................29
28. Indemnification, Liability Limitations................................................30
29. Exclusive Understanding................................................................30

APPENDIX "A" - EXAMPLE OF VESSELS' PARTICULARS.............................32
APPENDIX "B" - NON – NEGOTIABLE CARGO RECEIPT ..............................33
APPENDIX "C" - PORT COSTS ........................................................................34

# Contract of Affreightment (COA)

This Contract of Affreightment ("**Contract**") is made and entered into this 3rd day of August 2001.

BETWEEN:      **CSL INTERNATIONAL INC.,** a corporation organized and existing under the Laws of Barbados and having its registered office at Clarke & Co., Parker House, Wildey Business Park, Wildey Road, St. Michael, Barbados, and a business office at 55,Tozer Road, Beverly, Massachusetts, U.S.A.

(hereinafter referred to as "**CSL**")

AND:      **HANSON AGGREGATES MID PACIFIC, INC.,** a corporation organized and existing under the laws of Delaware, U.S.A. and having its principal office at 3000 Busch Road, Pleasanton, California, 94566 U.S. A.

(hereinafter referred to as "**HANSON**")

**WHEREAS,** subject to the terms and conditions hereinafter set forth, HANSON has agreed to ship and CSL has agreed to carry cargoes for the account of HANSON.

**NOW, THEREFORE,** for and in consideration of the reasons recited above and the mutual covenants and promises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, CSL and HANSON do agree as follows:

COA
Dated August 3, 2001 cont'd                    5

# 1.    Definitions and Appendices

### 1.1    Definitions

In this Contract, unless the context indicates otherwise:

(a)    **"Affiliate,"** means, with respect to each party, a person, corporation, trust, joint venture or entity directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with the such party;

(b)    **"Cargo"** has the meaning set forth in Clause 3 hereof;

(c)    **"Contract Year"** has the meaning set forth in Clause 5 hereof;

(d)    **"Control"** means, with respect to a person that is a corporation, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the shares of the controlled corporation and, with respect to a person that is not a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled person;

(e)    **"Owner"** means CSL or the owners of any vessel utilized in the performance of the Contract;

(f)    **"Party"** refers to anyone of HANSON or CSL and their respective permitted successors and assigns and **"Parties"** refers to them collectively;

(g)    **"Start Date"** means the first day of the month in which the first shipment is loaded under this Contract, but no later than October 1, 2001

(h)    **"Substitute Carrier"** means Vessels, watercrafts, or barges not owned by CSL or one of its affillates, chartered by HANSON to service this Contract as an additional or replacement carrier; and

(i)    **"Vessel"** or **"Vessels"** has the meaning set forth in Clause 4 hereof.

### 1.2    Appendices

The following appendices are attached to this Contract and form an integral part of this Contract, as if recited herein at length:

COA
Dated August 3, 2001 cont'd                                    6

|      |                |                                |
|------|----------------|--------------------------------|
| (a)  | Appendix "A"   | Example of Vessels particulars |
| (b)  | Appendix "B"   | Cargo Receipt                  |
| (c)  | Appendix "C"   | Port Costs                     |

**2.**     **Period**

This Contract of Affreightment (hereinafter referred to as this **"Contract"**) commences on the Start Date and shall continue for a period of five (5) years.

**3.**     **Cargo**

The Cargo will be aggregate products in bulk free of foreign objects that might damage the Vessel's self-unloading equipment.

Cargo shall be free of lumps exceeding eight 8 inches in any diameter and shall be free flowing and capable of being handled by gravity-fed belt conveyor self-unloaders.

**4.**     **Vessels**

CSL will provide to HANSON the details of the nominated Vessel thirty (30) days prior to the Vessel's first laycan for HANSON's written approval. HANSON shall not unreasonably delay or deny its written approval for any Vessel nominated provided the Vessel is compatible with the design of the loading facility and meets Canadian Coast Guard and environmental regulations. Once a Vessel has been approved such approval shall remain for the duration of this Contract.

CSL will supply its owned or chartered belt conveyor self-unloading bulk carriers, classed highest Lloyd's Register or equivalent, such as:

CSL ATLAS
CSL SPIRIT                          BERNHARD OLDENDORFF
SHEILA ANN                          SOPHIE OLDENDORFF
NELVANA                             CHRISTOFFER OLDENDORFF

Or similar substitute

Vessel particulars are in Appendix A attached hereto.

COA
Dated August 3, 2001 cont'd                    7

5.    **Cargo Quantity, Shipment Size and Scheduling**

For purposes of this Contract the term "Contract Year" refers to a twelve month period beginning on the Start Date and for each subsequent Contract Year, the twelve month period commencing on an anniversary of the Start Date. HANSON agrees to ship the minimum and CSL agrees to carry up to the maximum tonnage in each Contract Year as set out in this Clause.

Not less than 90 days prior to the commencement of each Contract Year, HANSON shall provide CSL written notice of the Cargo quantity HANSON intends to ship during such upcoming Contract Year, which quantity (the "Annual Declared Quantity") shall not be less than 1,067,050 MT or more than 2,465,220 MT. The Annual Declared Quantity for the first Contract Year is 1,067,050 MT. The minimum quantity to be shipped for each Contract Year shall be 85% of the Annual Declared Quantity for such Contract Year and the maximum quantity to be shipped for each Contract Year shall be 115% of the Annual Declared Quantity for such Contract Year. The maximum quantity for any given Contract Year may be exceeded by mutual agreement between HANSON and CSL.

HANSON or its agent will load and CSL will accept full and complete Cargoes (basis controlling draft, see Clause 7 hereof) as requested by the Master.

The term fairly evenly spread takes into consideration the seasonality of HANSON's business, however, the difference in change of the number of cargoes from one month to the next shall not be greater than two (2) cargoes, unless otherwise agreed between the Parties.

On the first day of each month of this Contract, HANSON will provide CSL with a three-month rolling schedule of anticipated requirements, which requirements are to be fairly evenly spread throughout the period.

Contained within the three month rolling schedule, HANSON shall provide seven (7) day laycan windows, fairly evenly spread, at the load port and CSL will then endeavour to schedule a Vessel as close to the early part of the laycan as possible.

In order for CSL to determine the Cargo lift of the shipment, HANSON in the rolling forecast shall also advise CSL of the expected discharge port for each shipment and whether HANSON intends to lighter all or any part of the Cargo into barges prior to the Vessel coming into berth or anchorage at the designated discharge port

It is understood that there is to be at least a five (5) day spread between CSL's Vessels arriving at the load port, in order to facilitate stockpiling.

COA
Dated August 3, 2001 cont'd                8

CSL shall provide notices to HANSON five (5) days prior to arrival at the load port, then 72/48/24 hours prior to arrival at the load port. If, however, the voyages are in direct continuation of one another (shuttle) then after the first of the shuttle voyages CSL shall provide notice upon departure of the last discharge port prior to arrival at the load port, thereafter 48/24/12 hours before arrival.  CSL shall provide to HANSON notice of the expected arrival time of a Vessel at the discharge port upon departure from the load port and thereafter 48/24/12 hours before arrival.

If CSL is unable to schedule a Vessel within HANSON's laycan, then CSL shall provide alternative dates within two (2) working days of receiving HANSON's requested laycans. If the suggested alternative period is not acceptable to HANSON, acting reasonably, then HANSON may schedule in a Vessel belonging to a third-party. If at the end of the then current Contract Year CSL has not carried the maximum quantity for such Contract Year in accordance with Clause 5 hereof, except to the extent such failure is due to a Force Majeure or the failure of HANSON to request delivery of such maximum quantity then CSL shall pay to HANSON the lesser of:

a)      the difference between the freight rate and stevedoring charges incurred by HANSON for such shipment(s) by the Substitute Carrier and the applicable freight rate that would have been incurred under this Contract to CSL for such shipment(s), that would bring the total quantity carried by CSL to the maximum Cargo quantity as set out in this Clause

        or

b)      one and one half (1.50) times the applicable freight rate that would have been incurred under this Contract for shipments that would bring the total quantity carried by CSL to the maximum Cargo quantity as set out in this Clause

Payment shall be made at the end of the Contract Year following the submission by HANSON of an invoice for such expenses together with such supporting detail as CSL may reasonably require.

If CSL fails to schedule a Vessel as provided in this section or, having scheduled a Vessel, the Vessel fails to arrive at the load port within the laycan and such failure occurs more than four (4) times in one twelve (12) month period, then HANSON may, in addition to and without limiting its rights under the previous paragraph, terminate this Contract.

COA
Dated August 3, 2001 cont'd          9

6.    **Load Port**

HANSON shall exercise due diligence to provide one (1) safe berth, always accessible with Vessel always afloat at Sechelt, British Columbia where HANSON guarantees a minimum mean low salt water draft of 48 feet.  HANSON or its agent at its own risk and expense shall load the Cargo.  Each Cargo shall be loaded as directed by the Master and mechanically loaded and trimmed to his reasonable satisfaction.  The Master shall give notice five (5) days in advance of arrival at the load port of his intended lift for the arrival draft specified in Clause 7 hereof, for the discharge port for such shipment identified by HANSON in the notice provided for in Clause 5 hereof.

Opening and closing of hatches to be performed by Vessel's crew. Vessel(s) shall be brought alongside loading berth with all holds empty, cleaned and ready to receive Cargo.

7.    **Discharge Ports**

HANSON shall exercise due diligence to provide one (1) safe berth or one (1) safe anchorage, always accessible with the Vessel always afloat at the discharge ports. CSL shall discharge the Cargo at such safe berth or safe anchorage always accessible with the Vessel always afloat.

For freight rate purposes only, HANSON guarantees the following minimum arrival drafts:

| Port | Draft |
|------|-------|
| San Francisco Pier 94 | 38 feet MLWS |
| Richmond | 38 feet MLWS |
| Oakland | 34 feet MLWS |
| Redwood City | 32 feet MLWB |

HANSON may, during the period of this Contract, designate other discharge ports and at the time HANSON designates such other discharge port it shall advise CSL of the draft MLWS that it will guarantee for freight purposes in respect of such port.

CSL will provide Vessels capable of carrying the following Cargo sizes, subject to a tolerance up or down of ten (10) percent more or less at CSL's option, at the corresponding arrival drafts:

| Guaranteed Draft | Cargo Size |
|------------------|------------|
| 32 feet MLWS | 39,500 MT |
| 34 feet MLWS | 43,500 MT |

COA
Dated August 3, 2001 cont'd                    10

| | |
|---|---|
| 36 feet MLWS | 47,500 MT |
| 38 feet MLWS | 51,500 MT |
| 40 feet MLWS | 55,500 MT |
| 42 feet MLWS | 59,500 MT |
| 44 feet MLWS | 63,500 MT |
| 46 feet MLWS | 67,500 MT |

Subject to securing the approval of all relevant authorities and compliance with the other provisions of this Contract, CSL may cause the Vessel to come into berth on high tides and in such event, for freight rate purposes, the Cargo lift will be the lift at the allowed draft for that tide and the freight shall be calculated on that basis.

Example:    If the allowed tide is 4 ft above 38 ft MLWS (and 38 feet is the HANSON guaranteed draft MLWS for the unloading port designated by HANSON) then the Vessel will load to 42 ft and freight will be based on 42 ft or 59,500 MT 10% MOLOO, or $4.49 per MT (the current rate set out in Clause 13 hereof). If the allowed tide is only 2 ft above the 38 ft MLWS, then the Vessel will load to 40 ft and the freight rate will be based on 40 ft or 55,500 MT 10% MOLOO, or $4.74 per MT (the current rate set out in Clause 13 hereof).

If CSL causes the Vessel to come into the San Francisco Bay at high tide, as provided above, CSL will assume the nautical risk for the tide and the risk of obtaining permission of the relevant authorities to come into berth at the discharge port previously designated by HANSON (including the risk that such authorities may at any time revoke any such allowance or permission), and CSL shall be responsible for and indemnify HANSON against all costs and expenses that may be incurred by CSL due to the Vessel arriving with a draft greater than the guaranteed draft for the designated discharge port, as set out above.

HANSON shall be responsible for any lightering costs (including barge costs) for lightering requested by HANSON or required due to HANSON's failure to unload the Vessel at the designated port in accordance with Clause 9 hereof. CSL shall be responsible for lightering costs (including barge costs) due to the Vessel arriving with a draft greater than the guaranteed draft for the designated discharge port, as set out above.

HANSON shall be responsible for the costs associated with any failure on its part to unload the Vessel in accordance with the provisions of Clause 9 hereof, other than those incurred due to the Vessel arriving with a draft greater than the guaranteed draft for the designated discharge port, as set out above, and not requested by HANSON.

COA
Dated August 3, 2001 cont'd                    11

8.     **Loading Terms**

Laytime commences upon tendering Notice of Readiness (NOR).  NOR to be tendered upon arrival at the load port to HANSON or its agent twenty-four 24 hours per day Saturdays, Sundays and holidays included (SSHINC).  NOR shall not be tendered until the Vessel has berthed and the Vessel's hatches open, holds empty, clean and accepted by the surveyor, and the Vessel is in all respects ready to receive the Cargo,.  If however a Vessel is prevented from berthing on arrival due to the unavailability of space at the berth, NOR may be tendered on arrival at or off port to HANSON or its agent twenty-four 24 hours per day SSHINC, whether the Vessel is in port or not (WIPON), whether the Vessel is in berth or not (WIBON), whether the Vessel is in free pratique (port health authorities clearance) or not (WIFPON), and whether the Vessel is custom cleared or not (WCCON),

If, on her arrival, the Vessel is required to wait for a berth at the anchorage due to unavailability of space at the berth, the actual time in shifting from the anchorage to the berth shall not count as laytime even if the Vessel is already on demurrage.  Time lost due to opening of hatches, cleaning holds, shifting or moving the Vessel, Vessel equipment breakdowns and the Vessel's failure to receive Cargo shall not count as laytime.

Vessel shall be loaded free of expense to CSL at an average rate of 3,500 MT per hour SSHINC, however the Vessel will not be loaded between the hours of 2200 and 0700 daily hereinafter referred to as (Nighttime Shutdown), and time not to count for one (1) Nighttime Shutdown per loading.  Time will also not count during the following holiday periods only from 2200 hours December 24th to 0700 hours December 27th and from 2200 hours December 31st to 0700 hours January 2nd.

Time shall end upon completion of loading and weight determination (draft survey).

If the Vessel arrives after the last day of her laydays or it is determined and agreed between HANSON and CSL that the Vessel will not arrive until after the last of her laydays, HANSON shall have the option to either cancel the voyage or accept the Vessel, in which latter event laytime shall commence as set forth above.

9.     **Discharging Terms**

HANSON shall ensure that the receiving dock(s) are available for CSL's Vessel(s) to berth upon arrival.  Laytime shall commence upon tendering NOR to HANSON or its agent twenty-four 24 hours per day SSHINC.

COA
Dated August 3, 2001 cont'd                    12

NOR shall not be tendered until the Vessel has berthed and is all fast alongside at HANSON'S designated receiving dock and the Vessel is in all respects ready to discharge the Cargo with hatches open. If however a Vessel is prevented from berthing on arrival at the discharge port and is held outside the port waiting for the berth due to congestion, traffic, lack of pilots or low water depth (unless CSL has assumed the risk of such water depth in accordance with Clause 7 hereof), or if HANSON elects to lighter NOR may be tendered at anchor on arrival at or off port to HANSON or its agent twenty-four 24 hours per day SSHINC, WIBON, WIFPON, WIPON, WCCON. In such event, the actual time in shifting from the anchorage to the berth shall not count even if the Vessel is already on demurrage.

HANSON and/or its customer/agent shall receive Cargo at an average takeaway rate of 2,500 MT per hour, 24 hours per day SSHINC; and shall be subject to demurrage if the receiving facilities and/or barges do not handle the Cargo at the average takeaway rate. Time lost due to opening of hatches, Vessel or Vessel equipment breakdowns and Vessel's failure Vessel to discharge Cargo shall not count as laytime. CSL will provide vessels, as described in APPENDIX "A", which are capable of discharging the Cargo at a minimum of 3,500 metric tons per hour.

10.    **Demurrage & Despatch**

HANSON shall pay demurrage at the specified demurrage rate for any time in excess of the time allowed under this Contract. Time allowed is the result of dividing the metric tons of Cargo lifted by the average load or discharging rates as described in Clauses 8 and 9 hereof respectively.

Demurrage shall not be payable for time lost due to opening and closing of hatches, cleaning of holds, Vessel breakdowns and Vessel's failure to receive Cargo at the loading rate stipulated in Clause 8 hereof and failure of the Vessel to discharge Cargo at the rate stipulated in Clause 9 hereof always provided the Cargo meets the description as provided in Clause 3 hereof.

The demurrage rate shall be:

| | |
|---|---|
| Year 1 | US $ 900.00 per hour pro rata |
| Year 2 | US $ 909.00 per hour pro rata |
| Year 3 | US $ 918.00 per hour pro rata |
| Year 4 | US $ 927.00 per hour pro rata |
| Year 5 | US $ 937.00 per hour pro rata |

CSL shall pay HANSON despatch at one-half of the specified demurrage rate for working time saved at the load port and the discharge port. Settlement of demurrage/despatch payments shall be agreed within thirty

COA
Dated August 3, 2001 cont'd                    13

(30) days from completion of discharge and paid within fifteen (15) days from settlement.

11.    **Damage to Vessel and/or Equipment**

If the Vessel or its equipment is damaged as a result of the action or omission of HANSON or its agent or as the result of HANSON or its agent loading any Cargo not meeting the description of Cargo in Clause 3 hereof, upon presentation of proper invoices, HANSON shall indemnify and hold CSL harmless for such costs. HANSON shall compensate CSL for any loss of Vessel time due to such damage at the specified demurrage rate. CSL shall give notice in writing to HANSON of such alleged Vessel and/or equipment damage promptly upon discovery of the damage, but in no event later than twenty-four (24) hours after completion of discharge. HANSON shall have the right to send a surveyor to the Vessel to survey such alleged damage. Should CSL fail to give HANSON the foregoing written notice, then HANSON shall not be held liable for such damage claim.

12.    **Freight Rates**

The Freight Rate, for each Contract Year for the applicable discharge ports specified in Clause 7 hereof, shall be paid in US Dollars per MT as follows:

| Guaranteed Draft | Freight Rate US $ per MT | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| 32 ft. MLWS | 6.04 | 6.10 | 6.16 | 6.22 | 6.28 |
| 34 ft. MLWS | 5.58 | 5.63 | 5.69 | 5.75 | 5.80 |
| 36 ft. MLWS | 5.24 | 5.29 | 5.34 | 5.40 | 5.45 |
| 38 ft. MLWS | 4.92 | 4.97 | 5.02 | 5.07 | 5.12 |
| 40 ft. MLWS | 4.63 | 4.68 | 4.72 | 4.77 | 4.82 |
| 42 ft. MLWS | 4.39 | 4.43 | 4.47 | 4.52 | 4.56 |
| 44 ft. MLWS | 4.17 | 4.21 | 4.25 | 4.30 | 4.34 |
| 46 ft. MLWS | 3.93 | 3.97 | 4.01 | 4.05 | 4.09 |

For Vessels arriving with drafts greater than the allowable draft in the ports specified in Clause 7 hereof, then the Vessel will discharge into barges and lighter down to the permissible draft for the specified discharge port.

COA
Dated August 3, 2001 cont'd                    14

The freight rate used for arrival at the lightering anchorage will be the rate that applies to the whole Cargo and not just the Cargo tons that are lightered.

Barge costs are for the account of HANSON, and any time waiting for barges shall count as laytime where HANSON is responsible for the lightering costs in accordance with Clause 7 hereof. Barge costs are for the account of CSL, and any time waiting for barges shall not count as laytime where CSL is responsible for the lightering costs in accordance with Clause 7 hereof. HANSON shall be responsible to provide barges under the Vessel's boom in order to allow the Vessel to discharge for purposes of lightering, regardless of which party is responsible for the lightering costs (including the barge costs) pursuant to Clause 7 hereof.

HANSON may designate from time to time additional discharge ports not specified in Clause 7 hereof and in such event the freight rate for such additional discharge port is to be mutually agreed.

The above freight rates are on the basis of Free In Stowed and Trimmed (FIST), and for either discharging the entire Cargo at one berth or lightering part of the Cargo into barges and then discharging the remainder at one berth. If the Vessel is to discharge at more than one berth and/or port then any costs associated with the Vessel shifting to and discharging at the second berth and/or port is to be for HANSON's account

The rates include one Nighttime Shutdown per loading. Any further delays will be charged at the specified demurrage rate unless excused under Clause 24 hereof.

If the Vessel does load without any Nighttime Shutdown then the freight rate will be reduced by US $0.14 per metric ton

The rates for lightering to barge are based on the Vessel arriving with 67,500 MT plus or minus a 10% allowance in CSL's option and lightering enough Cargo at an anchorage off the designated discharge berth in San Francisco Bay area and allowing the Vessel to proceed to its respective berth at the guaranteed draft above or as may be identified by HANSON as the guaranteed draft for any additional discharge port or ports. The freight rate applies to the whole 67,500 MT.

Volume shall be based on the quantity determined at the load port and set out in the Cargo receipt for such shipment.

COA
Dated August 3, 2001 cont'd                    15

Freight rates do not include Canadian Coast Guard Marine Services fee assessed at the load port. If such fees are assessed for any voyages under this Contract then they shall always be for HANSON's account.

Other than those charges, dues, tolls and port costs included in the freight rates, HANSON shall pay all dues, tolls, taxes, wharfage or any other charges of a similar nature on the Cargo or freight levied by municipal governments, state governments, the Government of Canada, the Government of the United States of America, or any other competent authority (except corporate income taxes). HANSON shall also pay any and all new or increased taxes on the Cargo or freight at loading or discharging ports and any other taxes (except corporate income taxes) assessments and governmental charges which are not in effect at present but which may be imposed in the future on the Cargo, freight or on the Vessel as it relates to this trade.

13.    **Freight Rate Re-Opener**

The freight rates (as they may be adjusted in accordance with this Contract will not be re-opened, provided, however, that if during the first Contract Year the total sum paid as despatch or paid as demurrage exceeds seven and one half (7.5%) percent of total amount paid in freight during such Contract Year, either Party may by written notice to other Party, made within sixty (60) days of the end of the first Contract Year, request an adjustment to the freight rate to reflect and to take into account the actual port loading or unloading conditions as applicable, and in such event the Parties shall mutually agree to such adjustments.

14.    **Freight Rate Adjustments**

Fuel (Bunker)

Freight rates on each voyage shall be subject to bunker adjustments based on last purchased price as substantiated by the presentation of copies of actual invoices. There will be no bunker adjustment provided the delivered price of IFO (180) falls within a "free range" of US $130.00 to US $150.00 per metric ton

If the delivered price of IFO (180) falls outside the "free range", for each one dollar price increase or decrease calculated from a base rate of US $140.00 per metric ton, the freight rate shall be adjusted up or down respectively by US $0.003 per metric ton to the San Francisco Bay area. Any freight rates agreed, as provided for in Clause 13 hereof, will have corresponding adjustment per metric ton and will be shown in the respective addendum.

COA
Dated August 3, 2001 cont'd                16

### Port Costs

HANSON will be responsible for those port costs set out in Appendix "C" hereto. The freight rates assume total port costs of US $53,575 per voyage (including both the load and discharge ports). There will be no port cost adjustment provided the port costs falls within a "free range" of US $48,575 to US $58,575. If port costs fall outside the "free range" then the freight rate will be adjusted on a per metric ton of Cargo basis by dividing the incremental increase or decrease over and above the US $53,575 by the Cargo lifted.

15.    **Commission**

No commissions or brokerage fees of any kind shall be payable under this Contract.

16.    **Payment Terms**

Freight is payable within fifteen (15) days of signing and issuing Cargo receipts by the Master, on ninety-five (95) percent of the Cargo receipt quantity. All freight is deemed earned on Cargo as loaded on board and shall be deemed earned discountless and non-returnable, Vessel and/or Cargo lost or not lost.

Balance of freight due upon agreement of any demurrage / despatch due as per Clause 10 hereof.

Freight payments shall be made by wire transfer to CSL's designated bank free of expense to CSL from HANSON's bank to such bank accounts, as CSL may designate to HANSON from time to time in writing.

Unless otherwise stipulated in this Contract, all other sums of money due under this Contract shall be paid within fifteen (15) days from invoice.

Any sum of money unpaid when due shall bear interest at the rate of ten percent (10%) per annum.

17.    **Deadfreight**

Deadfreight shall be payable by HANSON for any voyage in which HANSON fails to supply and load a Cargo sufficient to cause the Vessel to sail with a safe arrival draft at the discharge port consistent with port authority rules and regulations as called for by the Master or if there is less draft in the discharge port than the applicable guaranteed draft set out in

COA
Dated August 3, 2001 cont'd                    17

Clause 7 hereof, unless by mutual agreement the Vessel carries a part Cargo on behalf of HANSON.

Calculation of deadfreight shall be based on facsimile advice from the Master of the Vessel giving the theoretical full Cargo lift for the voyage. The rate for deadfreight shall be the same as the freight rate, inclusive of bunker adjustment and any adjustment for port costs, for Cargo loaded on the Vessel.

If the Master considers that deadfreight has been earned by the Vessel upon completion of loading at the load port, the Master shall notify HANSON or its agent of the number of deadfreight tons in writing prior to the Vessel's departure from the load port. HANSON shall have the option to load additional Cargo following receipt of such notice by the Master.

In the event that HANSON disputes the Master's claim that deadfreight has been earned, the difference in Cargo between the Cargo actually loaded and the theoretical amount of Cargo that could have been loaded considering the draft at the discharge port, shall be determined at the Load Port by a survey at HANSON's expense conducted by an independent surveyor mutually acceptable to CSL and HANSON. The survey result shall be final and binding in such determination on any deadfreight due or not due.

Any deadfreight payable to CSL hereunder shall count in the computation of the tonnage requirement set forth in Clause 5 hereof.

Failure by HANSON to ship its annual minimum Cargo in any Contract Year shall result in a deadfreight charge equal to seventy percent (70%) of the freight rate to the respective discharge port times the difference between the actual number of metric tonnes shipped and the contract minimum for that Contract Year. For purposes of calculating HANSON's compliance with the annual minimum Cargo provisions of Clause 5 hereof, Cargo not shipped due to CSL's failure to provide a Vessel, Cargo shipped by a Substitute Carrier due to CSL's failure to provide a Vessel, Cargo in respect of which HANSON has paid or is obligated to pay deadfreight in respect of a particular shipment and Cargo not shipped due a Force Majeure shall all be deemed to have been shipped.

18.    **Notices**

Any notice required or permitted hereunder shall be given by personal delivery or by prepaid registered or certified mail with return receipt requested, addressed as follows:

If to CSL:

COA
<u>Dated August 3, 2001 cont'd</u>                18

CSL International Inc.
55 Tozer Road,
Beverly, MA 01915
USA

Tel:    978-922-1300
Fax:    978-922-1772

Attention: Director of Customer Service

If to HANSON:

Hanson Aggregates Mid-Pacific, Inc.
3000 Busch Road,
Pleasanton, CA 94566

Tel:    925-846-8800
Fax:    925-426-4040

Attention: President

With copy to:

Hanson Aggregates West, Inc.
2680 Bishop Drive, Suite 225
San Ramon, CA 94583-4280

Tel:    925-328-1800
Fax:    925-244-1064

Attention:     General Counsel

or to such other addresses as either Party may designate by written notice
to the other Party.   Notice by personal delivery shall be effective upon
receipt.   Notice by mail shall be effective upon the date that the return
receipt is signed.   Notice given by other means shall be effective when
actually received at such address.

19.    **Governing Law**

This Contract shall be construed in accordance with United States
Maritime Law to the extent that such body of law needs to be
supplemented by the laws of the state of New York. Each Party, acting for
itself and its successors and assigns, hereby expressly and irrevocably

COA
Dated August 3, 2001 cont'd                    19

consents to the jurisdiction of the State and Federal courts of New York, as well as to any court of competent jurisdiction, for the confirmation or enforcement of any arbitration award. Both Parties waive any objection based on *forum non conveniens* or any objection to venue of any such action.

20.    **Arbitration**

The Parties shall endeavor to settle amicably any dispute, which may arise under this Contract. If, however, the Parties do not reach an agreement within a reasonable period (not to exceed thirty (30) days) either of them may submit the dispute to final and binding arbitration.

For disputes where the total amount claimed by either Party does not exceed US $300,000, such arbitration shall be conducted by a sole arbitrator appointed by mutual agreement of both Parties and the dispute submitted by documents only. If the Parties cannot agree on the appointment of a single arbitrator, then the arbitration shall be referred to a panel of three (3) persons. Such persons shall be appointed in accordance with the provisions of the following paragraphs.

Should any dispute arise between HANSON and CSL under this Contract, the matter in dispute shall be referred to three (3) persons in New York City, New York, one (1) to be appointed by each of the Parties hereto and the third, who shall be the Chair, by two (2) so chosen. Their decision, or that of any two of them, shall be final and binding, and for the purpose of enforcing any award, this Contract may be made a rule of the Court. The arbitrators shall be persons conversant in marine matters. All arbitrations shall be governed by the Maritime Arbitration Rules issued by the Society of Maritime Arbitrators of New York

In the event that arbitration is initiated between CSL and HANSON, each Party agrees, at the request of the other Party, to consolidate the arbitration proceeding between CSL and HANSON with any other arbitration proceeding to which either Party is or becomes a party and which pertains to this Contract, however, such agreement is without prejudice to each Party's right to select an arbitrator as above specified, so that in the event that the parties to the consolidated arbitration do not agree to otherwise constitute the panel, each party to the consolidated arbitration shall have the right to appoint one (1) arbitrator, and the party appointed arbitrators shall then appoint the minimum number of non-party appointed arbitrators to constitute an odd number arbitration panel. The Chair shall be selected by the majority of the panel.

COA
Dated August 3, 2001 cont'd                    20

The panel hearing the dispute shall have the authority to provide in any award for the division of the costs of arbitration, including reasonable attorneys fees, and arbitrators' fees.

## 21. Clause Paramount and Limitation of Liability

Notwithstanding anything herein contained, no absolute warranty of seaworthiness is given or shall be implied in this Contract nor shall apply to any voyages to be performed hereunder and it is expressly agreed that the Owner of the Vessels performing hereunder shall have the benefits of the "Rights and Immunities" in favor of the carrier or the Owner of said Vessels and shall assume the "Responsibilities and Liabilities" as defined in the International Convention for the Unification of Certain Rules Relating to Bills of Lading signed at Brussels on the 25th August, 1924 (the "Hague Rules") as amended, if that be the case, by the Protocol signed at Brussels on the 23rd February, 1968 (the "Hague-Visby Rules"). Nothing contained herein shall be deemed to be a surrender by the Owner of any Vessel performing hereunder of any of their rights or immunities or an increase of any of their responsibilities or liabilities under the Hague Rules or the Hague-Visby Rules. If any provision of this Contract or of any Charter Party be repugnant to the Hague Rules (or the Hague-Visby Rules, if applicable) such term, condition or exception shall be void to that extent but no further. Nothing in this Contract shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation or law contained in the enactment in the Country of shipment giving effect to the Rules contained in the Hague Rules.

## 22. Other Shipping Terms

### 22.1 Both-To-Blame Collision Clause.

If the Vessel comes into collision with another Vessel as a result of the negligence of the other Vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owner in the navigation or in the management of the Vessel, HANSON will indemnify the Owner against all loss or liability to the other or non-carrying Vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said Cargo, paid or payable by the other or non-carrying Vessel or her owners to HANSON and set-off, recouped or recovered by the other or non-carrying Vessel or her owners as part of their claim against the carrying Vessel or the Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any Vessel or Vessels or objects other than,

COA
Dated August 3, 2001 cont'd                        21

or in addition to, the colliding Vessels or objects are at fault in respect of a collision or contact.

22.2    New Jason Clause.

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the Cargo shippers, consignees or the owners of the Cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the Cargo. If a salving Vessel is owned or operated by the owners, salvage shall be paid for as fully as if the said salving Vessel or Vessels belonged to strangers. Such deposit as the owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by Cargo shipper, consignees or owners of the goods to the owners before delivery.

22.3    Ice Clause

(a)    In the event of the loading port being inaccessible by reason of ice when the Vessel is ready to proceed from her last port or at any time during the voyage or on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without the Cargo.

(b)    If during loading the Master, for fear of the Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what Cargo he has on board and to proceed to any other port or ports with option of completing Cargo for the Owners' benefit for any port or ports including port of discharge. Any part Cargo thus loaded under this Contract to be forwarded to destination at the Vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the HANSON, freight being paid on quantity delivered (in proportion if lump sum), all other conditions as per this Contract.

22.4    Liberties

The Vessel shall proceed to the HANSON berth with reasonable despatch. CSL has the right, in its reasonable discretion, to employ

COA
<u>Dated August 3, 2001 cont'd</u>                    22

any route, whether or not such route is the intended, advertised, most direct or customary route.

Without limitation of the foregoing, the rights and liberties of CSL under this Section may be exercised to bunker, if reasonably necessary at any time, with or without notice to HANSON, and the exercise thereof shall be deemed to form part of Voyages contemplated in this Contract or transit and shall not constitute a deviation therefrom.

The Vessel shall have liberty to sail with or without pilots, to tow and to be towed and to assist ships under all conditions. Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation, shall not be deemed to be an infringement or breach of this Contract.

**22.5    Responsibility Before and After Loading or Discharge**

CSL shall have no responsibility arising from circumstances or events occurring before loading and after discharge from the self-unloading boom of the Vessel.

**22.6    Lien**

CSL shall have a lien upon the Cargo for all unpaid sums of money, advances and/or charges (including General Average and all other charges and expenses referred to in other Sections hereof) due or to become due in respect of such Cargo.

**22.7    General Average**

General Average shall be adjusted at any port or place, at CSL's option, and shall be settled according to the York-Antwerp Rules 1974, as amended 1990. In the event of accident, danger, damage or disaster, before or after the commencement of the Voyage, resulting from any cause whatsoever, whether due to gross negligence or not, for which or for the consequences of which, CSL is not responsible, by statute, contract or otherwise, HANSON shall contribute with CSL in General Average to the payment of any sacrifices, losses or expenses of a General Average nature which may be made or incurred in respect of the Cargo. If a salving ship is owned or operated by CSL, or by others in associated ownership or management, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers.

COA
Dated August 3, 2001 cont'd                23

22.8    Himalaya

It is hereby expressly agreed that no Master, officer, director, employee, servant, mariner, pilot or agent of CSL, its subsidiaries and subcontractors, shall be under any liability to the shipper, consignee or owner of the Cargo or to any holder of the Bill of Lading for any loss, damage or delay arising or resulting directly or indirectly from any act, neglect or default on his part and, but without prejudice to the generality of the foregoing provisions in this Section, every exemption from liability, defense and immunity of whatsoever nature applicable to CSL or to which CSL is entitled thereunder shall also be available and shall extend to and protect every such Master, officer, director, employee, servant, mariner, pilot or agent of CSL, its subsidiaries and subcontractors and, for the purpose of all the foregoing provisions of this Section, CSL is or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who are or might be its Master, officer, director, employee, servant, mariner, pilot or agent, subsidiaries and subcontractors, from time to time and all such persons shall to this extent be or be deemed to be parties to this Contract.

22.9    War Risks

22.9.1  If:

    (a)    at any load or unloading port to which the Vessel may properly be ordered under the provisions of this Contract be blockaded; or

    (b)    owing to any war, hostilities, warlike operation, civil commotions, revolutions or the operation of international law:

        (i)    entry to any such load or unloading port or the loading or unloading of Cargo at any such port is be considered by the Master or CSL, in his or its discretion, dangerous or prohibited; or

        (ii)   is considered by the Master or CSL, in his or its discretion, dangerous, impossible or prohibited for the Vessel to reach any such load or unloading port;

HANSON shall have the right to order the Cargo to be loaded or discharged at any other load or unloading port within a reasonable range (provided such other port is not blockaded and that entry thereto or loading or unloading of

COA
Dated August 3, 2001 cont'd                    24

Cargo thereat or reaching the same is not, in the Master's or CSL's opinion, dangerous, impossible or prohibited).

22.9.2 If no order is received from HANSON within sixty (60) hours after HANSON or its agents have received from CSL a request for the nomination of a substitute port, then:

(a)    if the affected port is the first or only load port and no Cargo has been loaded, the voyage shall terminate forthwith;

(b)    if the affected port is a load port and part of the Cargo has already been loaded, the Vessel may proceed with the voyage. The provisions of this Contract shall govern such voyage, including the payment. of deadfreight;

(c)    if the affected port is an unloading port, CSL shall be at liberty to discharge the Cargo at any port which CSL or the Master may in its or his discretion decide on and such unloading shall be deemed to be due fulfillment under this Contract so far as Cargo so discharged is concerned.

22.9.3 If, in accordance with Clause 22.9.1 or 22.9.2 hereof, the Cargo is loaded or discharged at any such other port, the freight shall be paid as for the Voyage originally nominated, except that such freight shall be increased or reduced by the amount by which, as a result of loading or unloading at such other port:

(a)    the time on Voyage, including any time awaiting revised orders (which shall be charged at the then Demurrage rate applicable under this Contract);

(b)    the bunkers consumed (which shall be charged at the bunker costs at the port at which bunkers were last taken);

(c)    the port charges; and

(d)    any charge, cost or expense incurred by CSL for the Voyage actually performed are greater or less than those which would have been incurred on the Voyage originally nominated. Save as aforesaid, the Voyage actually performed shall be treated for the purpose of this Contract as if it were the Voyage originally nominated.

COA
<u>Dated August 3, 2001 cont'd</u>                          25

22.9.4 The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or local authority, including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the War Risks Insurance on the Vessel the right to give any such directions or recommendations. If, by reason of or in compliance with any such directions or recommendations, anything is done or is not done, such shall not be deemed a deviation.

If by reason of or in compliance with any such directions or recommendations, the Vessel does not proceed to the ports originally nominated or to which she may have been properly ordered under the provisions of this Contract, the Vessel may proceed to any unloading port on which the Master or CSL in his or its discretion may decide and there discharge the Cargo. Such discharging shall be deemed to be due fulfillment of this Contract and CSL shall be entitled to freight as if discharging had been affected at the port or ports originally nominated or to which the Vessel may have been properly ordered under the provisions of this Contract. All extra expenses (including those referred to in Clause 22.9.3 hereof) involved in reaching and discharging the Cargo at any such other discharging port shall be paid by HANSON and CSL shall have a lien on the Cargo for all such extra expenses.

22.10 Seizure and Arrest

Each Party shall take all reasonable measures and actions to prevent the Cargo and/or Vessel from being arrested or seized (including arrest or seizure resulting from the transport of unlawful substances) and the Parties will work closely together in taking such measures and actions. Any loss of time (at the Demurrage rate), expenses (including reasonable counsel fees), liability and/or fines incurred as a result of a breach of the aforesaid shall be for HANSON's account if caused by HANSON or by HANSON's employees, contractors or agents and shall be for CSL's account if caused by the Master, officers, crew or CSL's servants, contractors or agents.

COA
Dated August 3, 2001 cont'd                    26

### 22.11  Pollution

HANSON shall indemnify and hold CSL harmless from and against any and all fines, penalty or charges claimed or assessed against CSL by any competent authority attributable to pollution or contamination caused by the Cargo or HANSON's handling of the Cargo.

CSL shall indemnify and hold HANSON harmless from and against any and all fines, penalty or charges claimed or assessed against HANSON by any competent authority attributable to pollution or contamination caused by a Vessel or a Vessel's mishandling of the Cargo.

## 23.  Force Majeure

23.1  Neither Party shall be held responsible or liable, either directly or indirectly, or be deemed in default or breach of this Contract for (hereinafter **"Force Majeure"** or **"Force Majeure Event"**) any loss, damage, detention, delay, failure or inability to meet any of its commitments hereunder caused by or arising from any cause whether foreseeable or unforeseeable which is unavoidable or beyond its reasonable control, including without limitation, war, Act of God, hostilities, invasion, insurrection, riot, action taken or the order of any competent civil or military Government, or any State or local Government, explosion, fire, strikes, lockouts, labor disputes, perils of the sea and other waters, dangers of navigation, ice, storms or other adverse weather conditions, or other causes of a similar or dissimilar nature which wholly or partially prevent the Parties or either of them from carrying out the terms of this Contract (other than for the payment of moneys already earned hereunder); provided that the Party experiencing such Force Majeure promptly gives to the other Party written notice of the nature of such Force Majeure and that the disabling effect of such Force Majeure shall be eliminated as soon as possible and to the extent reasonably possible and that either Party shall have the right, in its sole discretion, to determine and settle any strike, lockout or labor dispute in which that Party may be involved.  Without limiting the scope of the preceding sentence, any delay in discharging the Vessel or inability to discharge the Vessel at a discharge port due to a labor dispute involving the stevedores at such port, including, but not limited to, a dispute involving a claim by such stevedores of the right to operate the Vessel during such unloading operations and the refusal of CSL to allow such Vessel operations by such stevedores, shall constitute a Force Majeure Event.  In the event that one Party's performance is suspended by Force Majeure, the

COA
Dated August 3, 2001 cont'd                    27

other Party's obligations to perform hereunder shall be suspended for the duration of the Force Majeure and for such additional reasonable period as may be required because of the existence of the Force Majeure.

If the Force Majeure materially impairs a party's ability to perform for a continuous period of 180 days or for a cumulative number of days in excess of 180 in any 12 month period, either party may, in its sole discretion, elect to terminate the Agreement by written notice to the other party, in which case the parties shall have no further obligations under this Agreement other than those accruing prior to such termination.

23.2   Consequences of Force Majeure

23.2.1   HANSON's liability for exceeding Laytime shall be absolute and shall not, except as stipulated in this Clause and in Clause 23.2.2 hereof, be in any case subject to the provisions of Clause 23.1 hereof. If a Force Majeure Event occurs at any port prior to or after the tendering of a NOR and, as a result, loading or unloading is delayed or interrupted for a period which, in respect of any given loading or unloading, amounts in the aggregate to at least twelve (12) hours, the provisions of Clause 23.2.2 hereof shall become applicable.

23.2.2   Within three (3) hours after the expiry of the twelve (12) hours from the occurrence of a Force Majeure Event, HANSON shall issue an order requiring CSL to load or unload the Cargo within a reasonable range from the Load Port or Discharge Port, as the case may be. If no order is received from HANSON at that time, then:

(a)   if the affected port is a Load Port and no Cargo has been loaded, the voyage shall terminate forthwith, however, HANSON shall remain liable for at least the twelve (12) hours demurrage provided for in Clause 23.2.1 hereof; or

(b)   if the affected port is a Load Port and part of the Cargo has already been loaded and if the Vessel is capable of being trimmed in a seaworthy condition satisfactory to the Master, the Vessel may proceed with the voyage to the Discharge Port. The provisions

COA
Dated August 3, 2001 cont'd                    28

of this Contract shall govern such voyage, including the payment of deadfreight; or

(c)    if the affected port is a Discharge Port, CSL shall be at liberty to discharge the Cargo at any port which CSL or the Master may reasonably choose and such unloading shall be deemed to be due fulfillment under this Contract, so far as the Cargo so discharged is concerned.

(d)    Notwithstanding the provisions of Clause 23.2.2 hereof, in the event that the Vessel is delayed due to any dispute between the stevedores and HANSON and/or their respective executors, administrators, other personal or legal representatives (including trustees and receivers in bankruptcy, liquidators, other similar officers), permitted assigns or agents, then time shall count as laytime after the first twelve (12) hours from the occurrence of the Force Majeure event at the then prevailing demurrage rate. For any delay greater than seventy-two (72) hours, or unless otherwise mutually agreed, CSL will be free to sail the Vessel and at liberty to discharge the Cargo at any port which CSL or the Master may reasonably choose and such unloading shall be deemed to be due fulfillment under this Contract, so far as the Cargo so discharged is concerned.

23.2.3    If, in accordance with Clause 23.2.2 hereof, the Cargo is loaded or discharged at any port other than the Load Port or Discharge Port, the freight shall be paid as for the voyage originally nominated, except that such freight shall be increased, as follows:

(a)    the time on Voyage, including any time awaiting revised orders (which shall be charged at the then current demurrage rate applicable under this Contract);

(b)    the bunkers consumed (which shall be charged at the bunker costs at the port at which bunkers were last taken);

(c)    the port charges at the alternate port; and

COA
Dated August 3, 2001 cont'd                    29

(d)  all other charges, costs and expenses reasonably incurred by CSL as a result of change of the Load Port or Discharge Port.

Such as aforesaid, the voyage actually performed shall be treated for the purpose of this Contract as if it were the voyage originally nominated.

## 24.  Assignment

This Contract and the rights and obligations hereunder shall not be assigned by HANSON or CSL without first obtaining the consent in writing of the other Party, such consent not to be unreasonably withheld, except either Party may, without the consent of the other, assign this Contract to an Affiliate, either by purchase, merger, consolidation, or otherwise. No assignment shall be effective unless and until the assignee shall assume in writing the obligations of the assignor hereunder

## 25.  Cargo Receipts, Precedence

CSL shall issue in respect of each shipment a non-negotiable Cargo Receipt in the form attached hereto as Appendix "B" which shall incorporate all terms, conditions, liberties, clauses and exceptions of this Contract. In the event of any conflict between the terms and conditions of this Contract and the terms and conditions of the Cargo Receipt or any other document, the terms and conditions of this Contract shall prevail.

## 26.  Agents

The agents at the load port and the discharge ports shall be CSL appointed agents. HANSON shall have the right to appoint and pay for protective agents at either port, and CSL shall instruct its agents to work cooperatively with respect to the sharing of information with HANSON's agents.

## 27.  Insurance, Indemnification, Liability Limitations

At all times during the Contract period, CSL shall, at its own cost and expense procure and maintain (i) marine hull and machinery insurance, (ii) marine protection & indemnity insurance. CSL shall provide HANSON at its request from time to time with certificates of proof of such insurance.

COA
Dated August 3, 2001 cont'd                    30

28.    **Indemnification, Liability Limitations**

In no event shall CSL or HANSON be liable to the other for any special, consequential or incidental damages, except as expressly provided in this Contract. Payment by HANSON of any applicable demurrage, deadfreight and the damage costs referred to Clause 12 hereof (which shall not include any payment for consequential, special or incidental damages), as provided for in this Contract, or payment by CSL of any sum referred to in Clause 5 hereof, shall constitute a full settlement and liquidation of any liability of HANSON to CSL or of CSL to HANSON for any and all losses of CSL due to the default or event giving rise to the payment of such demurrage, deadfreight or damage costs.

The failure of either Party hereto to insist upon the strict performance of any provision herein shall not be deemed a waiver of any subsequent breach or default of any provision herein.

29.    **Exclusive Understanding**

This Contract constitutes the complete and exclusive understanding between the Parties relating to the subject matter hereof and supercedes any and all prior negotiations, representations, agreements, correspondence and communications between the Parties with respect thereto. No change in, addition to, amendment of, or waiver of the terms and provisions of this Contract shall be binding upon either Party, unless approved in writing by a duly authorized officer or representative of each of the Parties hereto.

COA
Dated August 3, 2001 cont'd                    31

IN WITNESS WHEREOF, the Parties hereto have caused this Contract to be signed by their respective duly authorized officers.

By **HANSON AGGREGATES MID PACIFIC, INC.**

_(signature)_

Signature

FREDERICK A. Nelson
Name

By **CSL INTERNATIONAL INC.**

_(signature)_

Signature

Paul Corcoran
Name

COA
Dated August 3, 2001 cont'd                    32

## APPENDIX "A" - EXAMPLE OF VESSELS' PARTICULARS

| Metric Units | CSL Atlas | Bernhard Oldendorff | Christopher Oldendorff | Nelvana | Sheila Ann | CSL Spirit | Sophie Oldendorff |
|---|---|---|---|---|---|---|---|
| Length Overall | 227.4 | 245.00 | 227.73 | 243.03 | 224.90 | 224.90 | 224.90 |
| Beam | 32.00 | 32.20 | 32.23 | 32.20 | 32.19 | 32.19 | 32.19 |
| Depth | 19.2 | 20.10 | 19.20 | 20.00 | 19.51 | 19.51 | 19.51 |
| Boom Length | 77.00 | 76.00 | 77.00 | 81.70 | 79.00 | 79.00 | 79.00 |
| Max Boom Outreach | 61.00 | 59.90 | 60.88 | 65.60 | 62.90 | 62.90 | 62.90 |
| SSW Draft | 13.42 | 14.02 | 13.49 | 13.924 | 14.42 | 14.42 | 14.42 |
| Max. Sum. DWT | 67,634 | 77,499 | 62,594 | 74,974 | 70,037 | 70,037 | 70,037 |
| Holds Hatches | 5 10 | 7 9 | 7 7 | 7 20 | 7 7 | 7 7 | 7 7 |
| Min.Unload Capability tph | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| Built | 1990 | 1991 | 1982 | 1983 | 1999 | 1999 | 1999 |
| Converted | | | 1988 | | | | |
| Flag | BAH | LIBER | LIBER | VANU | BAH | BAH | TBA |
| Cubic | 70,737 | 72,104 | 59,702 | 75,457 | 66,503 | 66,503 | 66,503 |
| GT | 67,200 | 43,332 | 37,959 | 44,340 | 41,428 | 41,428 | 41,428 |
| NT | 21,901 | 19,471 | 16,736 | 19,671 | 19,174 | 19,174 | 19,174 |
| Height Keel To Coaming | 21.03 | 22.15 | 21.28 | 20.99 | 22.60 | 22.60 | 22.60 |

All numbers are given in good faith but without guarantee

COA
Dated August 3, 2001 cont'd                    33

## APPENDIX "B" - NON – NEGOTIABLE CARGO RECEIPT

See attached example


**CSL**
INTERNATIONAL

## NON-NEGOTIABLE CARGO RECEIPT

Ship No._____

Voyage/Cargo No._____

Shipper
_____

Consignee (Not to Order)
_____

Notify Party/Address

Vessel                                              Port of Loading

Port of Discharge                                  Place of Delivery

| Description of Goods | Gross Weight |
|---|---|

| Freight and Charges Payable as per Contract of Affreightment | Place and Date of Issue |
|---|---|
| Signed for | |

--------------------------------------------------------------
As Carrier

By

--------------------------------------------------------------
As Master, Authorized Officer or Agent(s) only to the Carrier

Above particulars as declared by the Shipper but not acknowledged by the Carrier. This Cargo Receipt shall incorporate all terms, conditions, liberties, clauses and exceptions of the Contract of Affreightment between CSL International Inc. and Hanson Aggregates Mid Pacific, Inc. dated August 3, 2001. In the event of any conflict between the terms and conditions of this Cargo Receipt and the terms and conditions of the Contract of Affreightment or any other document, the terms and conditions of the Contract of Affreightment shall prevail.

55 Tozer Road • Beverly, Massachusetts 01915 USA • Telephone: (978) 922 – 1010 • Facsimile: (978) 922 – 1772 • Telex: 49615296  CSL INTL

COA
Dated August 3, 2001 cont'd                34

## APPENDIX "C" - PORT COSTS

| Item | Sechelt $CDN | Pier 94 $US |
|---|---|---|
| Pilots  In / Out / Shifting | 7,000 | 8,920 |
| Tugs  In / Out | 17,200 | 8,000 |
| Dockage | 1,000 per call | 1,861 per day |
| Customs | 650 | 2,700 |
| Line handling | 3,250 | 4,800 |
| Vessel Reporting | | 200 |
| California Ballast Fees | | 400 |
| USDA / Aphis Fees | | 862 |
| Itos  (International Tug of Opportunity System) | 125 | |
| Agency | 2,400 | 2,122 |
| Communications | 450 | 650 |
| Transportation | 300 | 200 |
| Total | 32,375 | 30,715 |